Good morning. May I please the court? I'm Susan Walker of S&R Denton, U.S. LLP. Can you raise your microphone and step right into it? Thank you very much. I represent the appellant, National Fire and Marine Insurance Company. This case also presents the question of first impression for this court, and neither party has cited a case to this court that deals with a contribution claim at all like the one before it. And what is unique about this contribution claim is that it was awarded against a defending insurer, and that's my client, National, for a partial settlement that was entered into without its consent by two other insurers who were also defending the same insured in the same construction defect case, and that's Point Blank and Neapolis, Clarendon and Hawkeye. What National did was look at this issue in the context of the insured versus insured and the well-established rule that gives the insurer the right, when it's defending, to control the decision whether to settle the claim against its insured or take it no, wait, wait, wait, wait. We have to be careful about whether we're talking about the insured or the insurer. So could you say what you just said again, because I think that's better. Maybe I should use insurance company. That would be better. Right. I completely understand. And also, I would like to reserve four minutes for rebuttal, so I will try and keep my eye on the clock. So what National did was to look at this issue in the context of the insured and the insurance company, and where the insured is receiving a defense, it's the insurance company's right to decide whether to take the case to trial or not. If the insured, without the insurance company's consent, settles the case, it cannot recover for the settlement from the insurance company. Now, why these cases are relevant is they illustrate two principles that show this judgment is completely inequitable. And the first principle is that the judgment below affords greater rights to these insurance companies seeking contribution from my client than their own insured has under my client's policy. And there's no legal or equitable principle that supports that result. And the second prong why these cases are relevant is they illustrate that this judgment is in contravention of National's policy terms. It couldn't be clearer if point blank tried to recover for this judgment, this settlement from my client, it could not do so. And so this is because of the no action clause and the nonvoluntary payment clause in my client's policy. So this puts us in the situation where you have multiple insurers. And when you look at the facts of this case, the inequities become even more apparent. What the district court did was take 77.7 percent of a business decision by two other insurance companies and impose it on my client, and who was defending the insured, preparing for trial, doing everything it was supposed to under its policy and electing its rights to continue to defend. And the outcome, and so to take 77 percent of their business decision and impose it on National is inequitable. And when you look at the result, it – our client, National, obtained a settlement that was two and a half times better than the settlement that the other insurers obtained. There were 280 condominium units. So let's talk about that, because if I recall correctly, your client was the first to enter in and say, you know, get counsel and say, you know, we have a duty to defend. Is that right? That's correct. All right. Then the other two insurance companies came in, and they ended up having the same lawyer represent them. Is that correct? For a time. Yeah. Hawkeye and Clare, is that right? Those are the other two insurance companies. Right. Yes. So, I mean, isn't National's duty to defend triggered by the potential for coverage? I mean, they started out – they were working one time to try to see what could be resolved. In fact, all of them had gotten consultants to determine what the risk was during what period of time. And I think there were more than one consultant that said that during – that the range of possible settlement would be either like from $500,000 to $3 million, and that National might be vulnerable from what was based on the time that it was covering this whole construction project, because they had the last four years consecutive in a row, I believe. National went in, and then when National didn't like what was happening apparently, or – I'm still trying to understand. At some point, the other insurance companies, after looking at what the consultants say, you know, maybe we should settle. And National said, well, I'll only settle for $50,000. Isn't that what they said? We'll only settle. We're putting a cap on this, and if that's all we're going to contribute, and if not, we're going to – we're pulling out. And they ended up pulling out. I mean, is that some version of what occurred here? Not exactly. In some respects, I think that during the settlement process, which raises a whole other issue of the mediation privilege, but at one point in time, National did offer 50 percent to settle. Not $50,000. $50,000, excuse me. But then later, you know, it offered more. But the issue, I think what the Court's question puts two concepts together that are quite different. And one is what these consultants that you're referring to were talking about might be the outcome in the construction defect case against Point Blank. They're not at all concerned with insurance coverage. They're talking about what kind of judgment might be awarded against Point Blank. The issue and the right of the defending insurance company, that is one factor, is consider the issue of liability. And there were differences among the parties in terms of the strength of the liability defenses that Point Blank had. But from the insurance company perspective, not relevant to the consultants, is are there going to be covered damages? And this is a big issue in this case, because the insurance company has the right when it's defending under a reservation of right, and this is what all the insurance companies here were doing because they realized that it was quite possible that these construction defects were not going to be covered damages, that they could be things like the wrong material was used or the nails were not placed at the correct number of inches apart, things that aren't property damage. So that is where the business judgment of the insurance company comes in, because I think the appellees got it wrong in their papers when they said that an insurance company cannot take into account its coverage decisions when it's deciding whether to settle the case against its insured or take it to trial. The odd thing about this case, you're arguing the case as if there's an insured and an insurance company and there are only two parties. That's not this case, because the insured had insurance at various times from three different companies, so that there was coverage at all of these periods of time by someone. There may have been different sculpts. There may have been different language, but there was the insured had coverage. So what, and there is on the part of all of the insurance companies a certain duty to defend, I assume under Nevada law. And so the problem in this case, looking at it very simplistically, is that one of the insurance companies simply said, I'm getting out. This is it. I'm not going to participate further in this. And that left the others kind of holding the bag, and we have a, and so it gives rise to a little different situation than the one that you're describing. Let me clarify that factually. My client, National, always was defending point blank, never wanted to stop defending. Wanted to continue defending, and did, and appeared at trial, and the case settled at trial. The other insurance companies, Seattle East, they were the ones that wanted out. They said, let's settle. Kagan. So they settle, and it turns out they settle at a rate of two and a half times what my client ended up paying when it settled the case. But I think this brings the question back, because you're right. This isn't a case between an insured and an insurance company, but those cases are instructive because they show that this award of contribution is against our policy terms. But I think the correct result here, and what we put forth in the brief, is to leave the parties where they are. And one of the cases that we cited, the United Pacific v. Hanover case, quoted the California Civil Code, that says, between those that are equally in the right, the law does not interpose. In other words, here you have companies making different business judgments. There is no bad actor. There are disagreements over what should be done. Two insurance companies, the Appleys, Hawkeye, and Claredon, wanted to settle. They paid a lot more money on a per condominium unit than my client did. And then the district court awards 77.7 percent of their business decision against my client. But wasn't that based on time, on the risk approximation that was done? Correct. And I'm going to leave this point in a moment and go on to the other grounds as to why this judgment should be reversed. But to look at the first point in terms of the equity, if you have a court saying, well, here's the insurance company who had the majority of the responsibility potentially for this, and I'm going to take control away from them and I'm going to give it to other carriers who are going to take it away from them. Well, not take it away from them. National gave up control. National was in and could have stayed in. But they gave up their control. And I think that's a key distinction to be made here. It's not like they were never part of it. The other two companies came in later and then National just said, you know what, we're taking our toys home and we're going and you all do what you do. Because the outcome now would be if you're looking at equity and you're saying how much time on the risk would end up paying more if we leave the parties as they are, as you're requesting. And I'm not quite sure how that's fair. Let me address both of those points. But factually, I have to say it is inaccurate to – I don't know what the court has in mind by saying my client took its toys and went home. My client continued to defend. My client – it's the other carriers who didn't. It never walked away from anything. It was always there. It didn't agree to that settlement. It was only a partial settlement. They settled 200 – they, being the Apleys, settled 224 of the 280 condominium units at issue. And how is this fair? Let me explain to you what the calculation would be as it turned out. The 56 condominium units that my client, far from taking its toys and going home, was left to defend were settled at $1,700 per unit. If you multiplied that number by the number of units that the Apleys settled, okay, they settled 224, the dollar amount would be $400,000. And then you would be talking about how should that be allocated among the three. Instead, because of the settlement that they unilaterally, they being the Apleys, unilaterally entered into, they paid a larger amount of money and want to – a million dollars to settle 224 units and want my client to pay it. It's inequitable. And the result here is that my client, by exercising its judgment, continuing to defend and appearing at trial, negotiated a better deal and got a better result. And I – Are you going to reserve the last 40 seconds for rebuttal? Yes. I thought – okay. Thank you. May I ask a question? I'm sorry to keep you talking. I'm sorry. Judge McAmey had a question. Yes, Your Honor. Let me go back to – I can't hear you. Hold on a second. We can't hear you. Just a second. I'm sorry. Can I go back to the beginning of your argument? Hold on just a second, Judge McAmey. Is this any better? Yes. Yes. Okay. Now I have my notes covered. Okay. I want to go back to your beginning argument, and that is a case of first impression, because everybody seems to have acknowledged there's no Nevada law in this area of contribution, correct? Your Honor, actually, in contribution, there's no case on our facts. Okay. Well, that's what I'm getting at. Yes. And that is, was there any suggestion at the district court level or even our level at this time that this matter be remanded to the Nevada Supreme Court for a clarification of what their state law is? No. And, Your Honor, I think the reason is – Why not? The argument that we put forward regarding looking at the body of law in the insured versus insurance company context, that's the Hamilton case by the California Supreme Court. That case is cited with approval in Allstate v. Miller by the Nevada Supreme Court. And Nevada, both parties cited law that says on insurance issues, when it doesn't have a rule, it often looks to California law. And so we think – Well, I appreciate that they often look to it, but that doesn't mean that California is right all the time. And we have a problem in our own state with what they call Damron Agreements, where parties get together and then they – and this is not the same in any other state. And there's always the allegation, if you're the first settling party but you still have a duty to come in and defend, that are you using your best efforts to defend the interests of the other parties involved? And so there's a question then, so you're asking the district court later on to come in and mop up the entire operation. Your Honor, if I may just have one moment to address that. I think also that the case is – because it is equitable contribution, it is so confined to the particular facts that it isn't a case that calls out to create a general rule. It's what is equitable here. And I think that in the absence of the law, the district court looked at the facts but judged them incorrectly. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Josh Keane on behalf of the appellees. As you heard counsel state, this is a pretty straightforward equitable contribution action. All three carriers agreed to defend the case. And then substantial evidence was presented in the underlying action and during the district court action, which the district court considered and which was completely undisputed by National Fire in their moving papers in the cross motion for summary judgment and in their opposition papers to the motion for summary judgment. And the evidence is pretty substantial and pretty overwhelming. The Hawkeye, the first insurer, was on risk for a little bit more than a year. Clarendon was on risk for less than a year. And National Fire was on risk for four years. And the evidence that was presented in the underlying action is significant. And ironically, it was National Fire's defense counsel who was in the trenches. They are the ones who went to the site inspections. They're the ones who retained the experts. They're the ones who conducted the discovery. They're the ones who went to the mediations and were fully aware of the issues and the damages and the liabilities. And through 2006 and 2007, they issued reports. And this is the separate defense counsel that National Fire retained, advising National Fire there are substantial issues in this case that implicate the insured, point blank. And early on in the case, they advised National Fire that liability was going to be extensive. And the analysis never changed. The plaintiffs, the association in the underlying action, submitted a comprehensive defect list. And what's typical in the construction defect setting is these defect lists, which are produced and prepared by the experts, have analyzed these issues. And there were issues of water leaks. There were issues of stucco cracking. And when you're the framer, like point blank was, you are in essence, you touch every aspect of the project. So to bring it back to the point, National Fire was presented with a lot of evidence and information. So was Clarendon and so was Hawkeye. And it became overwhelming evidence to suggest that point blank was facing very, very high exposure in the case, especially if it went to trial. And Clarendon and Hawkeye did the right thing. They did the right thing by settling their potential exposure in the case. National Fire was advised of these decisions and given the opportunity to contribute. And they basically said, no, we want to continue on in the case. Well, they didn't just say no. They said the most we'll contribute is $50,000. Is that right? Correct. And what was their basis? That was their, that's all they were limiting it to? I'm trying to figure out what happened here and what the other option would have been. Well, Your Honor, that was really one of the main issues in the underlying case because Clarendon and Hawkeye were virtually unaware of why National Fire was coming up to these conclusions. And basically, they determined that coverage defenses precluded them from contributing more. And this is set forth in the record, too. There were some letters from the claims representative at the time, Richard Dunn, in writing to coverage counsel, Greg O'Day, advising them of some of these positions. Like, for example, they went through some of the defect claims while admitting that there was coverage in this case. How do we reconcile? Let me just ask you some questions that came up, especially based on your, Ms. White's presentation here today. I'm just trying to figure out how do we construe National's unwillingness to settle and contribute to this partial settlement as a breach of its duty to defend when, in fact, it seems that National proceeded to defend Point Blank based on its theory that Point Blank's liability was much lower. How do we reconcile that? Absolutely. That's a great question. When an insurer takes on the responsibility of defending the case, they have to consider all the facts and the evidence that is presented to them, including reasonable settlement offers. And the offers that were being presented, basically the 1 million and change that Clarendon and Hawkeye settled that port, the 224 units, was based on substantial evaluations from National Fires Defense Council, as well as counsel for Hawkeye and Clarendon. This was based upon expert information. And the mediator was also advising, hey, look, this is what you have an opportunity to settle. Otherwise, if this case goes to trial, you have $3 million. And did all of the policies involved, in fact, address the same risk? The insuring agreements and all the policies were virtually the same, and that's undisputed. All right. And would there be or is there a genuine issue of fact concerning when the damage occurred to determine whether the three, I guess, national policies in effect from 2002 to 2005 should be considered? There is no issue of fact. I mean, one of the hardest things to determine in a construction defect setting that all the courts have recognized and counsel recognizes is that when does the damage occur? Typically, in these cases, you never know. And the exclusion the national fire had relied upon in the latter three parties is not applicable here because the property damage could have happened in those policy periods to trigger coverage. We don't know for sure, and we will never know. These construction defect settings, unless you get, you know, a pipe burst or something like that, but when you have damage that takes place over time, you don't know whether it happens initially or whether it happens later on in the case. And I think that the Pepperell case that we cited recognizes that. A lot of these cases recognize that we don't know when the damage happens. And to buffer that, you know, companies have become smarter. They've tried to create exclusions or policy language to guard against these progressive type of damages. But they have to be specific and they have to be clear and reasonable. And here, the national fire policy is not clear. There's the exclusion is not clear. There's a case that we didn't cite in our brief but we touched upon in our argument called Pennsylvania General versus American Safety. And it addresses, it's, the site is 185 Cal App 41515. It's a 2010 case. And it really addresses the ambiguities. For example, the endorsement that talks about this exclusion, it interchanges the word occurrence, which could mean the accident, which could mean the damage. It also could, it also talks about damages and how occurrence interchanges with that is very ambiguous. We can't tell when the property damaged. And therefore, it's susceptible to multiple meanings and it can't be included in there. So if it can't be included in the analysis, it's a given that the insuring agreements on all of the national fire policies and Clarendon and Hawkeye apply equally. And so these cases addressing contribution where one insurer refuses entirely to defend an insured, are they apposite in this case when, in fact, National did tender a defense to point blank? It's, in the appellee's view, it's an irrelevant fact. Equitable contribution doesn't, on the surface and in general, doesn't specify whether you're a defending carrier or participating carrier or not. It doesn't matter. What matters is for an equitable contribution action is when the insurance companies share the same risk, if one overpays, then regardless of whether they're defending or not defending, then the one who overpays is entitled to equitable contribution from the one who didn't pay their fair share. And that is the basis of equity. They were defending, but they were defending on with the position that they would not pay more than this amount, 50,000. And they, so their breach was really in not, in refusing to participate in the settlement negotiation. Is that right? Yeah. I mean, the $50,000 evaluation, I think that they said that they would pay up to $50,000. So if their share was, you know, basically a settlement based upon their allocation that they agreed to take in their letters, they said I think at one point they would agree to take two-thirds with just one policy, mind you, not all four of them. And then they re, I think they re, there was a 70 percent, there was one letter that said 70 percent, then a subsequent letter that said I think two-thirds. So you're looking at a total settlement of like 67,000 to 75,000, which no one recommended. I mean, it was an absurd proposition. And given the fact, I think a salient point here is that when you have a mixed, a potentially mixed action, the analysis is clear and National Fire knew that there was coverage here. They set forth in their letters. When you are engaged in an action like this and you participate in an action, they have rights to recover. If they believe, if they agree to participate, they have the right to go after the insured at the end of the day for reimbursement. They were, National Fire reserved their rights to do this. So what the right thing to do and what the cases have instructed insurance companies to do, that if you do defend in a mixed action where there is covered claims and potentially non-covered claims, you defend the case and at the end of the day, you can go after the insured for reimbursement of the non-covered fees and costs. And I'm trying to figure out on what basis the district court arrived at the equitable contribution amount. I can kind of guess, but I don't know that he set forth the calculation and should he have. I'm trying to figure that out. Well, yeah, I believe in the appellee's motion for summary judgment, we, you know, the courts in equity can make a determination. There's a lot of different ways you can establish the fair shares. One is a time on risk basis. So what was presented to the district court was the time on risk basis. And it was based upon Hawkeye having a little bit over a year of policy, Clarendon having a little bit less than a year of policy, and National Fire having four years. And based upon the calculations of this time on risk allocation and considering all the factors, because it's not necessary that the courts just base it on a time on risk, they could look and make a determination based on. I understand what's possible. What did the district court here do and where is it set forth? Where is it set forth in the order? I think what my – it's the appellee's understanding that it took into consideration all the factors in the case. It took into consideration that National Fire improperly ignored its defense counsel's recommendations, improperly relied on coverage defenses. And so therefore came up with giving them or imposing what? I'm just trying to figure out where that is in the district court. And also considering application of the four policies. So National Fire had the greatest exposure in this case by far with four policies, with four years of coverage as opposed to less than a year for Clarendon and a little over a year for Hawkeye. And that was – and that was significant. The court stood out about an eight-page analysis of how it came up with its decision. And the court has – the district court can consider all of these factors, by which we remind this Court, were undisputed. National Fire never contested this and never contested any of the facts that were presented in the underlying motion. So the district court can consider all these factors to make a determination as to what the equitable shares are. It was based on – was it based on the number of units? In part, yes. The time on risk allocation was based upon the timing of construction of the units and the potential damage that flowed therefrom. Yes. So it did bear a relationship to the total settlement. Correct. Based on the coverage amount of time in the units. Correct. And typically on a time on risk calculation, it's the later carrier who bears the greatest burden, because they have a piece of every – typically of every unit or home that's in the construction defect setting, whereas the earlier ones don't have the greatest exposure, because once their policy expires and there's homes that flow afterwards, there's no exposure for them because the policy is over. Before your time is completely up, I just – your opposing counsel, Ms. White, said this – at the outset said this is a case of first impression. Do you agree with that? I do not agree with this – that assessment. This is an – this is a straightforward equitable contribution action. Are there factual differences between some of the cases this Court has addressed?  But for the most part, this is a straightforward equitable contribution case that this Court and the State Court and the District Court and the Nevada Court and all the courts throughout, you know, the Ninth Circuit have addressed. Okay. Judge McNamee, do you have any questions for this counsel? No, I do not. Thank you very much. Okay. Thank you. Thank you, Your Honor. Thank you very much. Ms. White, I think you have four seconds. I'll give you a minute. Excuse me. Your name is? Ms. Walker. Oh, I'm sorry. No problem. Oh, sorry. The calculation is – to answer the Court question where that 77.7 comes from, Mr. Keene put in a declaration with two calculations, one taking into account Nationals' four policies and one taking into account its one policy. The later three policies have an exclusion for property damage that begins before their policy periods. That's Keene Declarations, Exhibit 8 and 9. They – the appellees put in a 45.5 percent calculation, which is what Nationals' share would be if only its first policy calculated. But I have to say that there's a fundamental reason this case is first impression. There is no breach by my client. My client was always defending. So to use the term that there was a breach, no breach of duty to defend, it always defended, no breach of duty to settle. The Hamilton case that we cited says emphatically there can be no breach of the duty to settle without an excess judgment. That never occurred here. The other point that is worth noting is that this issue of the insurance company failing wrongfully to defend is the presumption that appellees relied on. This is the Safeco case from 2006. It engaged in shifting burden of proof to an insurance company that wrongfully refuses to defend. That is not my client. We always defended, and that burden is inapplicable. I would request opportunity to brief the Pennsylvania case that counsel did not inform the Court of before argument. I think that would be beneficial, too. And I appreciate the – If we think we need that, we will issue an order. All right. Thank you very much. Thank you both for your arguments today. The case is now submitted.
judges: McNamee, Schroeder, Murguia